UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| ATALLAH GROUP US INC. | : Index No. 22-7438 |
| Plaintiff, | : |
| -against- | : **COMPLAINT** |
| GMA ACCESSORIES, INC., | : **JURY DEMAND** |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### ATALLAH GROUP US INC.'S ANTITRUST COMPLAINT AGAINST GMA ACCESSORIES, INC.

Plaintiff Atallah Group US Inc. ("Atallah" or "Plaintiff"), by its attorneys, The Serbagi Law Firm, P.C., alleges against GMA Accessories, Inc. ("GMA") as follows:

### NATURE OF THE ACTION

1.   GMA has conspired in restraint of trade in violation of Section 1 of the Sherman Antitrust Act, which prohibits contracts, combinations, or conspiracies between two or more individuals or independent entities that unreasonably restrain trade (15 U.S.C. § 1).

2.   GMA is a trademark troll that entered into an illegal settlement agreement with Charlotte Olympia Holdings, Ltd. in 2018 to reinstate trademarks that GMA had abandoned. In that agreement, GMA agreed with a competitor to undo legitimate judicial findings that certain of GMA's "Charlotte" trademarks were abandoned. The purpose and effect of that agreement was to allow GMA to stifle competition and unreasonably restrain trade.  GMA has entered into similar agreements with other competitors, which preserved GMA's abandoned trademarks and

1

all of these agreements have the purpose and effect of reducing competition in the clothing industry. Taken together these illegal agreements are referred to herein as GMA's Anti-Competitive Agreements.  GMA's Anti-Competitive Agreement, taken together, are *per se* illegal agreements between horizontal competitors that perpetuates objectively baseless trademark claims by GMA and thereby unreasonably restrain trade.

3.   GMA's Anti-Competitive Agreements have reduced competition in the clothing industry and caused higher prices. The totality of the Anti-Competitive Agreements and GMA's bad faith litigation conduct and anti-competitive behavior has ensued over many years, which was enabled by the Anti-Competitive Agreements and is part of a pattern by GMA of anti-competitive and vexatious behavior generally.  GMA's Anti-Competitive Agreements and other agreements have enabled GMA to continue to assert abandoned trademarks has resulted in significant damage to legitimate competition, increasing costs and stifling competition.

4.   GMA leveraged GMA's Anti-Competitive Agreements to baselessly threaten and ultimately pursue sham litigation to cripple its competitors in the clothing industry from using the name Charlotte in any respect and it does so even though it has not used the mark Charlotte in actual commerce for many years, except for token use. GMA's scheme, as a trademark troll, is to sue competitors and thereby damage them, then settle those claims as quickly as GMA can before it has to face final adjudication of its frivolous litigation positions in court. By GMA's infringement and counterfeiting action in a litigation against Atallah and the designer Charlotte Knowles, who GMA sued for using her own name, and against numerous other retailers, GMA repeatedly took the position that Atallah is a competitive threat to GMA.  For example, at paragraph 82 of the Third Amended Complaint, GMA represented:

> The goods that Defendants advertise, promote, sell, or offer for sale in connection with the CHARLOTTE mark are products closely related to those for which GMA owns registered trademarks.

Thus, GMA leveraged GMA's Anti-Competitive Agreement to revive its abandoned trademarks and assert with more authority implausible claims against Atallah and others.

5.   Atallah therefore seeks treble damages resulting from GMA's unlawful conduct. Atallah also seeks declaratory and injunctive relief so that it may clear any baseless cloud of illegitimacy that GMA's exclusionary conduct places over Atallah (and many others) in the marketplace. The relief sought will allow Atallah to continue what it has been doing for decades—offering for sale and selling clothing bearing the Charlotte name. The declaratory relief sought will also allow Atallah to continue to grow, as it has for many years.

## PARTIES

6.   Plaintiff Atallah Group US Inc. (hereinafter "Atallah") is a Delaware Corporation with offices at 100 Crosby Street, suite 306, New York, NY, 10012.

7.   Defendant GMA Accessories, Inc. (hereinafter referred to as "GMA"), is a corporation, duly organized and existing under the laws of the State of New York, with a place of business at 1 East 33rd Street, New York, New York.

## JURISDICTION AND VENUE

8.   Atallah brings this action under the antitrust laws of the United States to obtain treble damages, equitable and other relief to prevent and restrain violations of Section 1 of the Sherman Act, U.S.C. § 1.

9.   This Court has subject matter jurisdiction because this action arises the antitrust laws of

the United States, 15 U.S.C. §§ 1, 15, 26  and thus presents a federal question (28 U.S.C. § 1331)

and one in which exclusive jurisdiction exists in federal court (28 U.S.C. §1338).

10. This Court has personal jurisdiction over GMA because it purposefully directed its

activities at Atallah, a resident of the state of New York, and this Complaint arises out of those

activities. GMA entered into the Anti-Competitive Agreements with Charlotte Olympia in this

State. In addition, GMA sued Atallah in this State.  This Court also has personal jurisdiction

over GMA because it maintains continuous and systematic contacts with the forum such that

the exercise of jurisdiction over it would not offend traditional notions of fair play and

substantial justice.

11.  Venue is proper in this district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391 (b) and

(c).

12.  Defendant GMA's principal place of business and a substantial portion of the events

giving rise to this case have occurred, and continue to occur, within this district. Finally, the

damage to Atallah described herein occurred and continues to occur in this judicial district.

13. All parties are present in the State and/or transact business anywhere to supply goods in

the State.

14. GMA committed tortious acts inside the State.

15. GMA derives substantial revenue from New York residents.

16. At all times material hereto, GMA derived substantial revenue from interstate commerce.

## **TRADE AND COMMERCE**

17.  GMA is a trademark troll that has used the Anti-Competitive Agreements to restrain

competition in  interstate commerce. Atallah's products and services involve a substantial

amount of interstate commerce.

4

## **HARM TO COMPETITION**

18. GMA  harms competition through the Anti-Competitive Agreements by:

    1.  harming the competitive process and disrupting the proper functioning of the free market by agreeing with a competitor to validate trademarks that were already deemed invalid;

    2.  restraining retailers from competing;

    3.  insulating GMA from competition from rival companies;

    4.  inhibiting other companies from competing;

    5.  restraining merchants from competing for customers with discounts, promotions, or other forms of lower prices and other benefits;

    6.  causing increased prices in the form of higher costs for legitimate Charlotte clothing;

    7.  causing increased retail prices for goods and services paid generally by customers; and

    8.  stifling innovation that would emerge but for the Anti-Competitive Agreement.

19. GMA's Anti-Competitive Agreements interfere with price setting at the point of sale. Without GMA's Anti-Competitive Agreements, Atallah and other parties would compete more vigorously. By the Anti-Competitive Agreements, GMA has helped to insulate itself from competition with other clothing competitors in the market. Prices in the market for clothing are higher than they otherwise would be because of GMA's Anti-Competitive Agreements. For example, Charlotte Knowles has had to increase the price of her company's clothing to reimburse Atallah for its litigation costs and the settlement and litigation costs incurred by its customers, all enabled by the Anti-Competitive Agreements.

## BACKGROUND FACTS

## THE ATALLAH BRAND

20.  Atallah Group is the owner of the world-renowned online e-commerce platform SSENSE, a multi-brand retailer specializing in the sale of authentic designer fashion and high-end streetwear. Since its inception in 2003, and through continuous efforts, Atallah Group has continuously used its unique SSENSE trademark as a source identifier to promote fashion designers and brands as well as offer a wide array of clothing and related products to discerning clients across the world. With more than 700 brands listed, Atallah, through its SSENSE trademark is able to offer more than 70,000 different products from well renowned fashion designers.

21. As a result, Atallah Group has been able to position itself as a trusted key player in the field of fashion and streetwear online retail and is now present in over 210 countries and regions throughout the world, offering services in French, English, Korean, Chinese, and Japanese, all the while gaining a strong position in this market.

22. With a workforce of more than 1,800 full-time employees and between 500 to 600 contractual employees during ramp up across North America and Europe, Atallah Group is considered a leader in its field and seeks, as its mission, to be "a creative community who believes challenging convention moves culture forward" and aim to "use [its] platform to amplify the voices that are changing the way we see the world." In order to operate, Atallah Group requires significant financial, technological and knowledgeable human resources and expertise in various areas such as fashion, administration, ads, media asset management, law, project management, SEO, IT, marketing, public relations, quality assurance, sales, customer support, and so on.

**THE CHARLOTTE KNOWLES BRAND**

23. Charlotte Knowles is a 30-year-old young lady who resides in England. She graduated in 2017 from Central St. Martins – the most prestigious fashion school in the world. Ms. Knowles created a highly niche luxury brand of expensive women's clothing based in the United Kingdom, which appeals to celebrities and high net worth individuals. The clothing previously sold under the Charlotte Knowles brand were expensive, niche, and took a long time to make, develop, and engineer. The fabric is sustainably sourced and the employees who made the clothes were all well paid. The clothing factories for the company are in the UK and Italy and most of the fabric is sourced from highly reputable Italian mills, located in Italy. Ms. Knowles' company sold its brand to specialty stores in Paris showrooms. "Charlotte Knowles" clothing items were priced between 220 pounds ($286 US) and 4,000 pounds ($5,207 US).

**2018 - THE ANTI-COMPETITIVE AGREEMENT**

24. On June 13, 2013, GMA opposed the registration of the mark "Charlotte Olympia" (Serial No. 79-103730).  Four years later, after multiple hearings, and sanction orders against GMA, by Order dated June 15, 2017, the TTAB issued a final judgment canceling the Charlotte Reg. Nos. 2535454 and 3922088 on grounds of abandonment and dismissing the opposition proceeding (the "TTAB Abandonment Order").  The Abandonment Order stated that GMA had made no showing that it used in commerce its Charlotte mark from 2011-2015.

25. After GMA's marks were deemed abandoned in the TTAB, GMA then sued Charlotte Olympia in the Southern District of New York for use of those same marks which were just held to be abandoned.

26. On April 6, 2018, the parties agreed to vacate the TTAB abandonment order.

27. By Order dated June 12, 2018, the TTAB, on consent and agreement between the parties, vacated the TTAB Abandonment Order.

28. GMA's agreement to reinstate abandoned trademarks is not a legitimate settlement but is a *per se* illegal agreement between competitors. The impact of the agreement can only be assessed by looking at the totality of GMA's bad faith litigation conduct and anticompetitive behavior over many years, which was enabled by the Anti-Competitive Agreement to reinstate abandoned trademarks.

I.     **GMA's SHAM LITIGATION AGAINST ATALLAH AND NUMEROUS OTHERS**
       **The Charlotte Litigation**

29.  On December 31, 2021, GMA filed a litigation against companies owned by the designer, Charlotte Knowles, including claims for trademark infringement, cybersquatting, and the more serious and particularly frivolous claim of Counterfeiting. GMA Accessories, Inc v. Unit 20 et al.. (Index No. 21-11227 (S.D.N.Y. 2022).

30. When Ms. Knowles refused to capitulate to GMA's attempt to extort her, on February 16, 2022, GMA ratcheted up its anti-competitive efforts and filed an Amended Complaint against Ms. Knowles customers, Notre and Lorenzo Hadar.

31. When Ms. Knowles still refused to capitulate to GMA's extortion efforts,, GMA filed a Second Amended Complaint on April 18, 2022, adding yet more of Ms. Knowles customers, namely Dover Street Market, Tenkei Corp., and Sensu, Inc.

32. When Ms. Knowles still refused to capitulate to GMA's threats of extortion, GMA filed a Third Amended Complaint on July 15, 2022, adding still more of Ms, Knowles cherished customers, namely New Six Limited, Shopstyle, Inc., and Modsens Inc.

33. The cumulative impact of GMA's litigious and incremental attacks on Ms. Knowles' customers was devastating to her, and particularly cruel and unnecessary.

**GMA's Frivolous Counterfeiting Claim**

34. Despite having lost a counterfeiting claim on summary judgment before Judge Castel, GMA asserts the same claim against Atallah and multiple other parties. In GMA Accessories, Inc. v. BOP, LLC, 765 F. Supp. 2d 457 (S.D.N.Y 2011). GMA argued that the Defendant Electric Wonderland, who did no more than provide showroom services to the fashion industry, committed counterfeiting by permitting others to sell fashion items in its showroom, one of which purportedly used the mark "Charlotte Solnicki." Judge Castel found that GMA's "Charlotte" designation was not only sufficiently different than "Charlotte Solnicki" to avoid a counterfeiting claim, but also that there was no allegation that Electric Wonderland sold spurious goods. GMA's counterfeiting claim against Atallah is baseless for the same reasons.

35. GMA knows that throwing around allegations of "counterfeiting" not only misleads consumers about the nature of its competitors' products, but also directly hinders competition by casting a cloud of illegitimacy over entire brands. Such baseless and harmful threats are particularly egregious because GMA knows that high end Charlotte Knowles clothing, cannot, as a matter of law, be counterfeits of GMA's scrunchies and schlock, where the products are so different and the Charlotte Knowles clothing had its own and different brand. Even the negative ruling in the BOP case did not stop GMA from recklessly accusing its competitors of "counterfeiting."

**GMA's Trademark Infringement Claim for Selling Charlotte Knowles Products is Also Objectively Unreasonable**

36.   In stark contrast to the Charlotte Knowles brand, GMA is a classic trademark troll. For example, Atallah conducted an extensive investigation, and it is almost impossible to find any GMA "Charlotte" clothing offered for sale, anywhere. Those findings were confirmed by multiple other individuals. There are, however, multiple other trademarks used in commerce that contain the word "Charlotte" (owned by companies other than GMA) for clothing that contain the word Charlotte. GMA's trademark registrations, which Atallah intends to prove were obtained and maintained by fraud and were abandoned, list schlocky items like charms, costume apparel, imitation leather handbags, bags made of beads, hats, scarves, and the like. While Charlotte Knowles showcased its products in Paris showrooms, where highly sophisticated buyers of stores made certain selections and then manufactured the clothing at great cost, that is a far cry from what happens with GMA's trinkets, which, to the extent one can find any, and Atallah couldn't, are made in China.

37. Consumer confusion is not only unlikely, but also inconceivable, which is exactly why there has been not a single instance of actual confusion even though the products co-existed in the marketplace for three years.. Thus, even though it was clear to everyone that consumer confusion between these vastly different products and different names would be inconceivable, in April 2021 Ms. Charlotte Knowles rebranded her clothing to "KNWLS" In response to GMA's litigation threats, Ms. Knowles changed her brand so that she would not have to incur the time and expense of GMA's Charlotte Infringement Litigation.

38. Even this conciliatory action was insufficient to satiate GMA's greed and dishonor, who filed its litigation against a 29 year old lady (who was just starting her career in high fashion)

on New Years' Eve, December 31, 2021, a particularly cruel and nasty maneuver by GMA, even for a trademark troll.

39. The Anti-Competitive Agreement has permitted GMA to pursue vexatious litigations with trademarks that were found to have been abandoned, with the intent to force Atallah and other competitors in the woman's clothing market to stop competing with GMA or to pay a settlement tax to GMA that ultimately is paid by consumers. The purpose and effect of the Anti-Competitive Agreement was to reduce competition in the market for women's clothing.

**GMA HAS STIFLED COMPETITION BY  TARGETING CUSTOMERS OF ITS ADVERSARY WITH FALSE STATEMENTS EVEN AFTER THE CASE WAS SETTLED**

40. In GMA Accessories, Inc. v. Positive Impressions, Inc., the district court granted an injunction, on consent of the Defendant, which injunction only stated that "defendants were enjoined "from using  the phrase "Floppy Friends" in the sale of its products."  GMA Accessories, Inc. v. Positive Impressions, Inc., 1999 U.S. App. LEXIS 10030, *3 (2d Cir. 1999). However, when GMA's counsel proceeded to send 2,350 letters to Defendants' customers falsely representing that Defendants' customers were themselves subject to the terms of the injunction, the district court granted the Defendant's motion to vacate the injunction. The Second Circuit affirmed. GMA Accessories, Inc. v. Positive Impressions, Inc., 1999 U.S. App. LEXIS 10030 (2d Cir. 1999). The Second Circuit stated:

> We reject as meritless GMA's suggestion that the district court as a court of equity lacks the power to vacate an injunction on the ground that the party in whose favor the injunction was entered has abused the injunction by misrepresenting to nonparties that they themselves have been enjoined and will be subject to sanctions.

Id. at *5.

11

**PREDATORY AND ANTI-COMPETITIVE LITIGATION AND THREATS OF
LITIGATION ARE GMA'S MODUS OPERANDI**

41. GMA has a long history of vexatious litigation, especially when it comes to pursuing

rivals with claims of trademark infringement. GMA regularly sends cease-and-desist letters and

sues clothing designers, manufacturers, and retailers that employ the word Charlotte and does so

without regard to the merits of any claim it asserts, with no basis to claim customer confusion of

any kind, and it litigates those cases with no honor or integrity, where virtually every statement

they make both to adversary counsel and the courts are pure fabrications and falsehoods. This

vexatious and dishonest conduct is generally how GMA wears down its competition, with threats

that constitute extortion and ultimately result in additional Anti-Competitive Agreements that

preserve GMA's ability to continue its extortion trolling, thereby diminishing competition and

harming consumers.

**GMA'S TRADEMARK REGISTRATIONS ARE FRAUDULENTLY MAINTED AND
ABANDONED**

42.  GMA is listed as the owner of the designation CHARLOTTE in International Class 18

for "sacks and bags" (Reg. No.  2,217,341), which it asserts against Atallah in the Charlotte

Infringement Litigation.  By judicial holdings and GMA's own admissions, this registration

lists goods that are abandoned and not used in commerce.

43. GMA is listed as the owner of the designation CHARLOTTE in International Class 18

for clutch bags and leather/imitation leather handbags.  (Registration 3,453,664), which it

asserts against Atallah in this litigation. By judicial holdings and GMA's own admissions, this

registration lists goods that are abandoned and not used in commerce.

44. GMA is listed as the owner of the mark CHARLOTTE in International Class 25 for

"clothing, footwear and headgear, namely hats, scarves, gloves and socks." (Reg. No.

2,535,454), which it asserts against Atallah in this litigation. By judicial holdings and GMA's own admissions, this registration lists goods that are abandoned and not used in commerce.

45. GMA is listed as the owner of Registration of the mark CHARLOTTE in International Class 25 for "shoes" (Reg. No. 5,700,815), which it asserts against Atallah in this litigation. By judicial holdings and GMA's own admissions, this registration lists goods that are abandoned and not used in commerce.

46. GMA also has a trademark registration for the mark CHARLOTTE in International Class 14, for charms, chokers, and custom jewelry, earrings, jewelry for the head, necklaces, and ornamental pins (Reg. No. 3,922,088). By judicial holdings and GMA's own admissions, this registration lists goods that are abandoned and not used in commerce.

47. GMA's trademark registrations Nos. 2,217,341, 3,453,664, 2,535,454, 5,700,815, and 3,922,088 are referred to herein as "GMA's Charlotte Trademark Registrations."

**GMA IS A TRADEMARK TROLL WHO DOES NOT USE ITS MARKS IN COMMERCE AND HAS ADMITTED TO SUCH NON-USE, FURTHER HINDERING LEGITIMATE COMPETITION**

48. GMA is a classic trademark troll. The only "Charlotte" product Atallah found sold by GMA anywhere in many years is a ten-piece child hair scrunchie set for $9.95. Yet, with no clothing products on the market, GMA implausibly alleges there is a likelihood of consumer confusion between its various trinkets and schlock listed in its trademark registrations and the high-end fashion Ms. Knowles offered in Paris showrooms. Consumer confusion between the parties' respective marks is inconceivable because no consumer would ever believe that GMA (who no one in the clothing industry has ever heard of), sponsored, or otherwise approved the use of the elite and high-end "Charlotte Knowles" European brand.

49. Atallah's extensive investigation and the investigation of others shows no use of GMA's "Charlotte" products in commerce of the goods listed on GMA's trademark registrations or any

other goods for that matter. The only Charlotte products Atallah's investigators found in commerce were Charlotte products sold by numerous third parties, unrelated to GMA. In prior cases, GMA has failed to provide any evidence of use in commerce, except to say that it sells clothing. Atalla's trademark investigators at Marksmen conducted a very thorough search, but they were not able to find any use by GMA of "Charlotte" clothing and they found no place of business where GMA sells "Charlotte" clothing, either at a brick-and-mortar location or online. All that the highly experienced Marksmen trademark investigators found was evidence we will use to show that GMA is a trademark troll that sues various companies solely to extort quick settlements.

50. Based on GMA's own admissions in the trademark infringement and counterfeiting litigation against Atallah, , it does not have any documents in its office to produce that would demonstrate use in commerce of its purported Charlotte products, as a real company that markets products would have. Instead of producing documents from its own files, it relies almost entirely on documents it produced to the law firm Pryor Cashman in an opposition proceeding that ended in 2017. Well into the litigation GMA produced some purported invoices for sales it recently made, but Atallah's investigation revealed that those sales were sham sales, designed to fool the Court into making it appear as if the Charlotte brand was in use in commerce, which is not the case.

51. But even in 2017, the documents that GMA produced to Pryor Cashman were reviewed by the TTAB, and it found that GMA had abandoned its trademarks and made no use of Charlotte from 2011-2015.

52. By Declaration dated 2016, GMA's principal represented, in a TTAB proceeding against Charlotte Olympia Holdings, Ltd. (Opp. No. 91211164), that GMA offers its goods for sale in

GMA's showroom at 1 East 33rd Street, in New York. The TTAB stated it considered that statement but found it to be unavailing based on the evidence presented. Likewise, Atallah's investigators were told by a GMA representative that there are no Charlotte items on display in GMA's so-called showroom. Again, in the Charlotte Trademark Litigation, GMA again asserted that it had Charlotte products in some showroom.  In any event, the supposed display of Charlotte products in a closed showroom that our investigators could not even enter is not "use in commerce."

**GMA HAS ATTEMPTED TO FOOL THE DISTRICT COURT BY RECENTLY POSTING CHARLOTTE ITEMS ON ITS WEBSITE, WHICH ITEMS WERE NOT LISTED ON THAT WEBSITE WELL INTO THE LITIGATION**

53. Atallah's trademark investigator at Marksmen conducted its search for GMA "Charlotte" products in April and May 2022 and issued its comprehensive report on May 20, 2022.  The search included the Capelli web site, which it alleges is the dba for GMA – GMA itself has no web site. As noted, Marksmen found no listing of Charlotte products anywhere on the Capelli web site.

54. As GMA's litigation with Atallah in the Charlotte Infringement Litigation gets closer to trial and the Defendants called out GMA for not offering for sale any Charlotte products anywhere, GMA, as part of its scam to fool this Court, recently created a new link for Charlotte branded items on its Capelli website, which link was previously absent.

55. The new posting of Charlotte products on the Capelli web site was done to fool this Court into believing those items were on sale during the time of the alleged period of infringement.

56. Numerous other individuals have periodically checked the Capelli website for Charlotte products and confirm the foregoing findings.

**GMA HAS ADMITTED THAT IT HAS NO EVIDENCE OF USE OF ITS CHARLOTTE MARK SINCE THE TTAB FOUND THE GMA TRADEMARK REGISTRATIONS WERE ABANDONED**

57.  In response to document requests, and in open Court in the case <u>GMA Accessories, Inc. v. New Six Limited</u>, et al., Index No. 1:21-cv-11227 (LGS) (JLC), GMA stated that it had no responsive documents to produce from its own files that were not duplicative of the documents it previously produced to Pryor Cashman from 2014-2017. This admission alone proves that GMA has not made use of its Charlotte mark in commerce since at least 2017.  But even the documents it produced in the TTAB proceeding revealed that GMA had not made any use of its Charlotte mark in commerce from 2011-2015.  Late into the litigation, GMA produced a few documents that appear to show some more recent sales, but on information and belief, GMA concocted those sales to fool the court.

**<u>GMA'S DECEPTIVE AND DISHONEST ACTS IN COMMERCE</u>**

58. As set forth above, GMA does not sell Charlotte branded products "in commerce" and at best has made token use of  the mark by some clothing sales. Yet, as trademark trolls do, GMA engaged in a long series of adversarial actions against numerous companies, litigating against them with a hyper-aggression, whereby they repeatedly engage in the most unethical litigation behavior, demanding large payments that constitute no less than extortion.  GMA asserts false and frivolous claims that have no chance of success, it repeatedly refuses to produce documents in the cases it litigates, sending attorneys on wild goose chases to out-of-state warehouses, and then quickly settles so as to preserve its abandoned marks so it can then go on to extort payments from the next victim. GMA has a long series of negative rulings against it, both in the TTAB and in federal court, where it has been repeatedly sanctioned and criticized, over and over, year after year, yet GMA keeps litigating as if those negative rulings do not

exist, even taking positions in new litigations that are in contrast with findings that have been made against them in the past. Many other reputable members of the Bar from GMA's prior cases are lined up to testify in this litigation, and provide additional details of GMA's bad faith, unethical, and vexatious conduct.

59. The cumulative effect of GMA's Anti-Competitive Agreements is to enable GMA to pursue litigations with purported trademark registrations otherwise impossible to pursue and to tax companies and hinder competition.

## GMA'S KNOWINGLY FALSE REPRESENTATIONS TO THE PTO CONCERNING THE SUBJECT REGISTRATIONS

60. As set forth above, GMA does not sell Charlotte branded products in commerce and its repeated representations to the PTO that Charlotte is used in commerce constituted fraud, requiring cancellation of GMA's registrations.

61. On January 29, 2018, GMA submitted a renewal form Section 8 and 9 to the United States Patent and Trademark Office for Reg. No.  2,217,341, for the mark Charlotte, where it swore under penalty of perjury that the mark was in use in commerce for all the goods listed in that registration.  Based on GMA's admissions in the case, and the investigations Atallah has conducted, and the documents GMA has produced and failed to produce, the goods that formed the basis of that registration were not "used in commerce," as GMA swore to the PTO, and therefore the submission and representation was fraudulent.

62. On August 9, 2017, GMA submitted a form Section 8 and 9 to the United States Patent and Trademark Office for Reg. No.  3,453,664, for the mark Charlotte, where it swore under penalty of perjury that the mark was in use in commerce for all the goods listed in that registration. Based on GMA's admissions in the case, and the investigations Atallah has conducted, and the documents GMA has produced and failed to produce, the goods that formed

the basis of that registration were not "used in commerce," as GMA swore to the PTO, and therefore the submission and representation to the PTO was fraudulent.

63. On September 24, 2021, GMA submitted a renewal form Section 8 and 9 to the United States Patent and Trademark Office for Reg. No.  2,535,454, for the mark Charlotte, where it swore under penalty of perjury that the mark was in use in commerce for all the goods listed in that registration.  Based on GMA's admissions in the case, and the investigations Atallah has conducted, and the documents GMA has produced and failed to produce, the goods that formed the basis of that registration were not "used in commerce," as GMA swore to the PTO, and therefore the submission and representation was fraudulent.

64. On January 29, 2018, GMA applied to the United States Patent and Trademark Office for Reg. No. 5,700,815, for the mark Charlotte, where it swore under penalty of penalty of perjury that the mark was in use in commerce for all the goods listed in that registration since January 29, 2018.  Based on GMA's admissions in the case, and the investigations Atallah has conducted, and the documents GMA has produced and failed to produce, the goods that formed the basis of that registration were not "used in commerce," as GMA swore to the PTO, and therefore the submission and representation was fraudulent.

65. On October 20, 2020, GMA submitted a renewal form Section 8 and 9 to the United States Patent and Trademark Office for Reg. No. 3,922,088, for the mark Charlotte, where it swore under penalty of perjury that the mark was in use in commerce for all the goods listed in that registration. Based on GMA's admissions in the case, and the investigations Atallah has conducted, and the documents GMA has produced and failed to produce, the goods that formed the basis of that registration were not "used in commerce," as GMA swore to the PTO, and therefore the submission and representation was fraudulent.

66. Atallah has no adequate remedy at law.

**GMA HAS ABUSED THE JUDICIAL SYSTEM FOR THE PURPOSE OF EXTORTING SETTLEMENTS AND STIFLING COMPETITION FOR MANY YEARS, RESULTING IN NUMEROUS CRITICISMS AND FINDINGS AGAINST IT**

67. Many Courts have found that GMA's behavior exceeds the bounds of permissible advocacy.  GMA also is completely undeterred by those findings and re-litigated here claims it already lost in other courts. GMA has been repeatedly criticized and sanctioned for misrepresenting the facts and the law to numerous courts, failing to disclose adverse authority to the Court, and for overzealous litigation tactics.We have not found a single company in the reported case law so repeatedly and heavily criticized and sanctioned for bad behavior and vexatious conduct.

68. Courts have found GMA's Charlotte mark is a weak mark and that GMA has shown no identifiable market presence. Undeterred, GMA's bad behavior continues here, in full force. For example:

- In <u>GMA Accessories, Inc. v. Positive Impressions, Inc</u>., 2000 U.S. Dist. LEXIS 5667 (S.D.N.Y. 2000), the court engaged in a highly detailed analysis of GMA's discovery misconduct. The Court awarded all of Defendants' reasonable attorneys' fees, and expenses plus an additional $10,000.  The decision includes scathing and extensive findings of GMA's improper tactics.

- In **GMA Accessories, Inc. v. BOP, LLC**, 765 F. Supp. 2d 457, 467 (S.D.N.Y. 2011), GMA was ordered to show cause why it should not be sanctioned for violating Rule 3.3 of the Rules of Professional Conduct for failing to disclose adverse authority of which it was aware.

- In **GMA Accessories Inc. v. Dorfman-Pacific Co.**, 2012 U.S. Dist. LEXIS 161350 (S.D.N.Y. 2012), the court criticized GMA for asserting "without any evidentiary basis" that his

adversary's client abandoned its trademark. The Court found that "the evidence of continuous

usage of the mark is clear and unambiguous . . ." The Court noted that GMA's

abandonment argument was "totally specious." Id. at 10.

● In **M.P.D. Accessories B.V. v. Urban Outfitters, Inc**., 2015 U.S. Ap. LEXIS 23113 (2d

Cir. 2015) ("It is further ORDERED that decision on the request for sanctions is DEFERRED

and [GMA], is hereby ORDERED to show cause, within 28 days of the filing of this order, why

sanctions should not be imposed for seeking to withdraw the appeal in 14-2533 over which this

Court had jurisdiction in favor of filing this appeal, over which the Court clearly lacked

jurisdiction").

● *GMA Accessories, Inc. v. Croscill, Inc.*, 2007 U.S. Dist. LEXIS 17589 (S.D.N.Y. 2007),
in speaking of the relative strength of the parties' marks, the Court stated:

> GMA has presented no evidence regarding consumer recognition
> of the mark as indicating origin of the goods. A factfinder could
> reach differing conclusions, based on the limited record before the
> Court, as to whether the parties even utilize "Charlotte" as a
> designator of origin, as opposed to simply as a style name, let
> alone whether the public recognizes it as such. "Lack of evidence
> that consumers associate the [mark] with [the trademark owner]
> weighs against finding the [mark] is strong in the market place." M
> & G Elecs. Sales Corp. v. Sony Kabushiki Kaisha, 250 F. Supp. 2d
> 91, 102 (S.D.N.Y. 2003). Nor has GMA presented evidence that
> the mark is heavily advertised, or other evidence from which its
> prominence in the marketplace may be inferred.

Id. at *4-*5. A year later, Judge Lynch expressly found in the same case that GMA's "Charlotte"

is a relatively weak mark.  Judge Lynch Stated:

> Although GMA's "Charlotte" mark is suggestive, and thus
> possesses a moderate degree of inherent distinctiveness, the record
> is utterly devoid of any evidence of acquired distinctiveness.
> Indeed, despite the Court's observation in its prior opinion that
> GMA had "presented no evidence regarding consumer recognition
> of the mark," GMA Accessories, Inc., 2007 U.S. Dist. LEXIS
> 17589, 2007 WL 766294, at *2, GMA has failed to remedy this
> evidentiary defect as the record still contains no affirmative
> evidence of marketplace recognition.

20

* * *

As defendants point out, however, the extensive and prior use of the word "Charlotte" by numerous third parties significantly undercuts GMA's claim of strength. In particular, Charlotte Russe Merchandising, a national retailer whose annual sales are hundreds of times larger than those of GMA, began using its "Charlotte Russe" mark on women's fashion items and accessories almost twenty years prior to GMA's first use of its "Charlotte" mark. (Murphy Aff. PP 4-6.) See Time, 173 F.3d at 118 ("The use of part or all of the mark by third parties weakens its overall strength."). Moreover, although the record contains numerous examples of GMA's promotional activity, GMA admittedly cannot calculate with any specificity the amount it has spent on advertising for "Charlotte." The only quantifiable evidence in the record reflecting advertising on "Charlotte" goods amounts to less than $ 17,000 for the entire life of the mark. (D. Rule 56.1 Stmt. P 27.) Such "meager promotional expenditures" weigh against a finding of acquired distinctiveness. H. Lubovsky, Inc v. Esprit de Corp., 627 F. Supp. 483, 487 (S.D.N.Y. 1986).

In sum, while GMA's "Charlotte" mark is suggestive of its women's fashion items and accessories, the lack of evidence establishing any commercial recognition of the mark means that, as a matter of law, "Charlotte" is a **"relatively weak mark[] in the place where it counts: the marketplace."** 2 McCarthy 11:83, at 11-186-11-187.

*Croscill, Inc.*, 2008 U.S. Dist. LEXIS 16052, at *15-17.

### The PTO Has Also Found Plaintiff's "Charlotte" Mark to be Insufficiently Strong to Preclude Registration of Another Charlotte Mark for Clothing

CKF Designs filed with the United States Patent and Trademark Office ("PTO") a trademark application for the mark CHARLOTTE FRIESE for "clothing and apparel, namely, dresses, blouses, shirts, tops, pants, skirts, scarves, jackets and coats (Serial No. 88/368,262). CKF Designs claimed a first use date of February 23, 2019, well after the first use dates listed in the GMA's registrations. On June 12, 2019, the PTO issued an Office Action, in which it denied registration for CHARLOTTE FRIESE based on the existence of six other CHARLOTTE registrations for various clothing items. As stated by the PTO in the Office Action, the five of the

CHARLOTTE registrations it listed were owned by the same registrant, GMA Accessories, Inc.,

the Plaintiff in this action.

69. On December 12, 2019, the Applicant CKF argued in its Response to Office Action:

> There is a crowned field of CHARLOTTE marks in Class 25, so Applicant's mark with its unique FRIESE component should be permitted to coexist as well. **There are 35 registrations or approved applications for CHARLOTTE marks in Class 25 for clothing and/or footwear.** See Exhibit A – summary chart and TESS records. These marks are owned by about 30 different companies/individuals. n The USPTO has allowed all of these marks to coexist, despite the shared CHARLOTTE COMPONENT and the similarity of the goods. Indeed, the registrations cited by the Examining Attorney prove this point as they are owned by two unrelated registrants . . . Where there is a crowned field of marks, slight differences in the marks are sufficient to distinguish an applicant's mark from the field. For example, the USPTO has allowed the following CHARLOTTE marks, with their unique additional elements, to coexist with the cited marks: CHARLOTTE RUSSE, CHARLOTTE TILBURY, CHARLOTTE BRODY, CHARLOTTE DANIEL, CHARLOTTE ESKILDSEN, CHARLOTTE GAINSBOURG, CHARLOTTE RONNSON, CHARLOTTE STONE, and SOPHIE CHARLOTTE. None of the coexisting marks in Class 25 contain FRIESE or anything closely similar thereto. Accordingly, Applicant's CHARLOTTE FRIESE, is sufficiently different from the other CHARLOTTE marks to avoid confusion, In view of the foregoing, Applicant requests that its marks not be singled out for refusal, rather permitted to coexist with the other CHARLOTTE marks in Class 25.

(emphasis added). In response to CKF Design's arguments, and evidence of multiple Charlotte

registrations, the PTO passed the mark CHARLOTTE FRIESE for Publication on February 12,

2020. Significantly for preclusion purposes, Plaintiff did not oppose the registration for

CHARLOTTE FRIESE and the mark was officially registered on May 19, 2020. The mark is

still valid and in force. Since December 12, 2019, multiple additional CHARLOTTE marks have

been registered.

**Atallah Had No Choice But to File the Present Antitrust Claim**

70. Each of GMA's claims in the Charlotte Infringement Litigation against Atallah are objectively baseless. For example, GMA has not sold more than token use of Charlotte products "in commerce" for many years, yet it seeks to stifle legitimate competition by preventing those who wish to provide such products from doing so. No reasonable litigant could have realistically expected success on the merits of GMA's claims.

71. GMA's repeated threats and shifting legal theories and bad faith litigation conduct left Atallah with no choice but to file the instant suit for declaratory relief. Given GMA's well-known modus operandi and its aggressive posture toward Atallah, it was apparent that continued frivolous litigation was inevitable unless Atallah agreed to withdraw many of its products from the marketplace, which would be at significant cost to Atallah.

## VIOLATIONS ALLEGED

72. GMA's Anti-Competitive Agreements unreasonably restrains competition in the market for woman's clothing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

73. GMA's Anti-Competitive Agreements have and will continue to have anticompetitive effects by protecting it from competition and enabling it to continue to engage in vexatious litigation conduct. GMA's' restraints unlawfully insulate GMA from competition and increases costs of the market for clothing, increases prices, reduces output, harms the competitive process, raise barriers to entry and expansion, and retards innovation.

74. GMA's Anti-Competitive Agreements are not reasonably necessary to accomplish any of Defendants' allegedly procompetitive goals, although they have no procompetitive goals. There are no procompetitive benefits because the Anti-Competitive Agreements resolve baseless litigation and preserve GMA's flawed and abandoned trademarks.  Further, any *de minimis*

procompetitive benefits are outweighed by anticompetitive harm, and there are less restrictive alternatives by which GMA would be able reasonably to achieve any procompetitive goals.

## ANTITRUST INJURY TO ATALLAH

75.  GMA's Anti-Competitive Agreements revived GMA's invalidated trademarks, which in turn permitted if not encouraged GMA to continue to threaten its competitors with those trademarks, assert  sham litigation, and now cause significant and ongoing injury to Atallah. GMA's conduct has hampered Atallah's ability to compete, raising its costs and diverting its resources.

76. GMA's baseless threats presented Atallah with a Hobson's Choice: stop using its legitimate marks and pay-off GMS  or suffer heavy litigation costs that will render Atallah unable to compete as aggressively and ultimately may render it non-competitive. Each option is anticompetitive.

77. The costs of litigating are stifling to Atallah. Instead of investing in growth, marketing, and increasing output, it is forced to spend potentially millions of dollars on litigation based on frivolous claims. This was precisely GMA's intent, that is to bring frivolous and expensive to defend claims, and thereby extort settlements that enable the scheme to continue to assert abandoned marks. Using litigation as an anticompetitive weapon was both the specific intent and has been the effect of GMA's pre-litigation and litigation conduct. GMA's pre-litigation and litigation anticompetitive conduct is the sole cause of the stifling litigation costs that have driven Atallah to this litigation. Atallah would not have suffered this injury without GMA's anticompetitive course of conduct.

78. Not only do the costs of litigation render Atallah unable to compete as effectively and threaten to drive Atallah out of the relevant market, but GMA's baseless claims that Atallah

sells counterfeit goods casts a false shadow of illegitimacy over Atallah in the marketplace, which amplifies the anticompetitive impact of the lawsuit itself.

79.  In addition to using baseless threats and sham litigation to unlawfully raise its rival's costs and stifle competition, GMA has leveraged its market position to threaten and punish one of Atallah's business relationships in a thinly veiled attempt to coerce the withdrawal of Atallah from the relevant markets.

80. On information and belief, GMA has threatened other competitors who may have offered similar products. Some of those boutique shops have been forced to discontinue sales of their products because they simply cannot afford to litigate against GMA.

81. GMA's Anti-Competition Agreements cause harm to the market for clothing generally. It is the consumer for women's clothing that will suffer impact by paying higher prices for clothing. There is no redeeming or anti-competitive impact to the Anti-Competitive Agreement, which harms not only Atallah, but the market for women's clothing through higher prices and increased costs.

## **CLAIM 1**

### **(VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1)**

82. GMA incorporates in this claim the allegations in all the foregoing paragraphs.

83.   The Anti-Competitive Agreements are agreements in restraint of trade in violation of Section 1 of the Sherman Act.

84.   The Anti-Competitive Agreements are agreements between horizontal competitors that resolve and perpetuate objectively baseless claims by GMA.

85.    The Anticompetitive Agreements place some restrictions on the ability of the companies GMA has sued to use their own marks.

86.     The individual and cumulative effects of the Anti-Competitive Agreements are to raise costs and  misallocate resources, which ultimately harms consumers.

87.   Because the Anti-Competitive Agreements are agreements among competitors that harm competition and the competitive process and provide no pro-competitive benefit, they are per se illegal under the antitrust laws.

88.    If this court determines that the Anti-Competitive Agreements are not *per se* illegal, in the alternative, we allege the agreements are illegal under a "quick look" approach.  The Anti-Competitive Agreements provide no pro-competitive benefits and harm competition in the market for women's fashion.

89. Women's fashion in the United States is a relevant product market for purposes of the antitrust laws.

**<u>REQUEST FOR RELIEF</u>**

WHEREFORE, Plaintiff prays that final judgment be entered against GMA,  declaring, ordering, and adjudging that: (i) GMA Violated the Sherman Act 15 U.S.C. § 1; (ii) GMA be permanently enjoined from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, carry out, or renew the agreements in which it is alleged to have engaged, or any other agreement having a similar purpose or effect in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (iii) GMA reimburse Atallah for its lost sales in clothing bearing the Charlotte name and all other parties from who it has obtained settlement payments based on its Charlotte mark;

(iv) be awarded its costs of this action, reasonable attorneys' fees, treble damages, and such other relief as may be appropriate and as the Court may deem just and proper.

Respectfully Submitted,

THE SERBAGI LAW FIRM, P.C.

By: /s/ Christopher Serbagi

Christopher Serbagi, Esq.
488 Madison Avenue, Suite 1120
New York, New York 10022
Tel: (212) 593-2112
 Fax: (212) 308 8582

*Attorneys for Atallah Group US Inc.*

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Defendant respectfully demands a trial by jury on all issues so triable.

Dated: August 31, 2022
New York, New York